IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RAYMOND BATISTA,

          Plaintiff,

                                   No. 3:12-cv-00920-HZ

                                   OPINION & ORDER

      v.

COLUMBIA COUNTY;
JEFF DICKERSON, Personally;
DEREK HIBBS, Personally;
RYAN SCHOLL, Personally;
METRO WEST AMBULANCE;
LEGACY EMANUEL HOSPITAL,

          Defendants.

Leonard Randolph Berman
LAW OFFICE OF LEONARD R. BERMAN
4711 SW Huber Street , Suite E-3
Portland, OR 97219

      Attorney for Plaintiff

Stan LeGore
MILLER & WAGNER, LLP

1 - OPINION & ORDER

2210 N.W. Flanders Street
Portland, OR 97210-3408

> Attorney for Columbia County,
> Jeff Dickerson, Derek Hibbs, and
> Ryan Scholl

HERNANDEZ, District Judge:

This action arises out of an injury Raymond Batista suffered to his left eye during an altercation he had with two other inmates on June 7, 2010, while in custody at Columbia County Jail (the "Jail"). Plaintiff brings claims against Columbia County; Jeff Dickerson, the elected Columbia County Sheriff; and Derek Hibbs and Ryan Scholl, two Deputies at the Jail. Plaintiff alleges violations of his Eighth Amendment rights pursuant to 42 U.S.C. § 1983 against Dickerson, Hibbs, and Scholl.[1] Plaintiff also alleges negligence (1) for the negligent hiring, training, and supervision of deputies Hibbs and Scholl; (2) for failing to "timely and expeditiously protect" Plaintiff; (3) for failing to "minimize" his injury; and (4) for "housing . . . a murder [sic] and . . . white supremacists in the general population." Am. Compl., ¶ 13. Additionally, Plaintiff alleges Monell violations against Dickerson for "promulgating and maintaining an unconstitutional policy of understaffing".[2]

Now before me are Defendants' motion for summary judgment (dkt. #57) and Plaintiff's motion for partial summary judgment (dkt. #51). For the reasons that follow,

---

[1] Plaintiff also brought claims against Metro West Ambulance, Inc. and Legacy Emanuel Hospital, but those defendants have since been dismissed.
[2] Plaintiff also alleges medical negligence on the part of Columbia County for delaying treatment of his left eye. Defendants state Plaintiff represented to them that he will not proceed with this claim, and Plaintiff does not argue otherwise.

Defendants' motion for summary judgment is GRANTED and Plaintiff's motion for partial summary judgment is DENIED.

## BACKGROUND

On May 28, 2010, Plaintiff began serving a twenty-day sentence in the Jail's "C-Pod."[3] LeGore Decl., Ex. 1, p.1. The Columbia County Jail is divided into discrete residence areas, or "Pods," where inmates are housed based on their security classifications. Rush Decl., ¶ 7. Inmates are classified according to their "security risk" at the time they are admitted to the Jail, and are classified as either "Maximum, Medium[, or] . . . Minimum security [risk]." Id. Classifications are reviewed monthly. Id. An inmate's classification level is based on the "charges pending against the inmate or the nature of the inmate's conviction; the inmate's criminal history; and . . . the inmate's institutional behavior." Id. A-Pod is comprised of inmates classified as Maximum security risk, whereas C-Pod is comprised of inmates classified as either Medium or Minimum security risks. Weaver Decl., ¶ 4.

The Pods are constantly patrolled and monitored. See Deming Decl., ¶¶ 3-4. A control technician in the Jail's control room has a direct line of sight to most of the Pods and monitors the Pods on video screens. Id. In addition, two Rove Deputies patrol the Pods. Hibbs Decl., ¶ 3. The Rove Deputies make at least two physical entries into each Pod every hour and make additional entries into the Pods throughout the day for other purposes, including mail delivery and pickup, cleaning, distributing toiletries, checking fire door and equipment, escorting inmates, and responding to calls for assistance by inmates. Other deputies and jail staff are also tasked with observing inmates. Id.

---

[3] Plaintiff was initially placed in A-Pod.

3 - OPINION & ORDER

The incident at issue here occurred on June 7, 2010, around 1:35 p.m.  LeGore Decl., Ex. 3, p. 7.  Carolyn Deming, a Control Room Technician at the Jail, received a call from an unidentified male inmate from one of the cells in C-Pod asking for immediate emergency assistance.  Deming Decl., ¶ 7.  When asked what was wrong, Deming received no response.  Id.  Deming immediately radioed the Deputies.  Id.  Hibbs arrived in C-Pod in less than a minute from Deming's call and located Plaintiff, who was sitting in his cell with a bloody towel over his eye.  Id.; Hibbs Decl., ¶ 6.  When Hibbs asked Plaintiff what had happened, Plaintiff removed the towel.  Hibbs then called for assistance over the radio.  Hibbs Decl., ¶ 6.  Deputy Feakin subsequently arrived and Hibbs and Feakin escorted Plaintiff to the Jail's medical area, where a nurse immediately examined Plaintiff and determined that he be taken to a hospital.[4]  Id., ¶ 9.  After Feakin took photos of Plaintiff's injury, Hibbs and Feakin escorted Plaintiff to Booking at 1:46 p.m., where Plaintiff's release papers were prepared and an ambulance was called to transport Plaintiff to the hospital.  Id.  At 2:01 p.m., the ambulance arrived and took Plaintiff to the hospital.  Rush Decl., ¶ 4.

Immediately following the attack, Dickerson requested a full investigation of the incident by the Washington County Sheriff's Office ("WCSO"), an outside agency.  The WCSO began their investigation on June 8, 2010, and reported directly to the Columbia County District Attorney ("CCDA").  The investigation showed that Plaintiff's June 7, 2010, altercation was with inmate Ashley Siclovan, who had stabbed Plaintiff, and inmate David Scott LaVelle, who had "assisted" Siclovan.  Dickerson Decl., ¶ 8.  The CCDA, however, declined to file charges against either Siclovan or LaVelle.  Id., ¶ 15.

---

[4] While Plaintiff was examined by the nurse, Hibbs stayed with Plaintiff while Feakin went to Booking to get a camera to photograph Plaintiff's injuries.

## STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. E.g., Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party need only demonstrate that there is an absence of evidence to support the non-moving party's case. Id. at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" Id. at 324 (quotation omitted). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. Id. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment ." Id. However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact

and defeat summary judgment.  See Thornhill Publ'n Co., Inc. v. GTE Corp., 594 F.2d

730, 738 (9th Cir. 1979).

## DISCUSSION

### I. Defendants' Motion for Summary Judgment

#### A. First Claim: Eighth Amendment

The Eighth Amendment prohibits "cruel and unusual punishments" thereby

placing "restraints on prison officials".  Farmer v. Brennan, 511 U.S. 825, 832 (1994)

(citation omitted).  The Eighth Amendment also places duties upon prison officials to

"take reasonable measures to guarantee the safety of the inmates".  Id. (citations omitted).

To establish an Eighth Amendment violation under §1983, a prisoner "must satisfy both

the objective and subjective components of a two-part test." Toguchi v. Chung, 391 F.3d

1051, 1057 (9th Cir. 2004) (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir.

2002)).  First, the plaintiff must show that the prison official deprived him of the

"minimal civilized measure of life's necessities."  Id. (citation omitted).  Second, he must

demonstrate that the prison official "acted with deliberate indifference in doing so."  Id.

(quotations and citation omitted).  "A prison official acts with deliberate indifference . . .

only if the [prison official] knows of and disregards an excessive risk to inmate health

and safety."  Id.  "Under this standard, the prison official must not only be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists, but

that person must also draw the inference."  Id.  "If a [prison official] should have been

aware of the risk, but was not, then the [official] has not violated the Eighth Amendment,

no matter how severe the risk."  Id.

Defendants argue that Plaintiff's first claim for relief alleging violations of his Eighth Amendment rights pursuant to § 1983 against Dickerson, Hibbs, and Scholl fails because they are entitled to qualified immunity, there is no evidence showing that Dickerson or Scholl personally participated in violating Plaintiff's constitutional rights, and there is no evidence showing Defendants were deliberately indifferent.[5]  Plaintiff does not respond to Defendants' arguments and suffice it to say, does not proffer any evidence supporting his claim.  After carefully considering Defendants' arguments and the evidence before me, I conclude that Plaintiff fails to meet his burden of establishing a triable issue of fact as to whether Defendants violated his Eighth Amendment rights.

### 1. Dickerson and Scholl

In an action brought under § 1983, as here, plaintiff must show "personal participation by the defendant. . . . A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.  There is no respondeat superior liability under section 1983."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (citations omitted).

Plaintiff's claim that Dickerson and Scholl violated his Eighth Amendment rights is unavailing.  The record shows that Dickerson and Scholl were not on duty or present at

---

[5] The analysis of whether a government official is entitled to qualified immunity involves two steps.  E.g., Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citation omitted).  "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right."  Id. (citations omitted).  Second, "the court must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct.  Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right."  Id. (internal quotation marks and citations omitted).  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Id. at 236.

the Jail when Plaintiff was attacked.  With regard to Scholl, the undisputed evidence

shows he started his shift on June 7, 2010, at 3:00 p.m.–well after Plaintiff was allegedly

attacked at 1:35 p.m., and had only heard about the attack during his "shift briefing"

when he started work that day.  Scholl Decl., ¶¶ 3, 10.  With respect to Dickerson, the

evidence shows that he was not present at the Jail at all on June 7, 2010, let alone

responsible for monitoring inmates or supervising anyone working at the Jail on June 7,

2010.  Dickerson Decl., ¶ 3.  Based on the evidence before me, Plaintiff fails to meet his

burden of establishing a genuine issue of material fact as to whether Scholls and

Dickerson personally participated in his alleged constitutional violations.  Accordingly,

Defendants' motion for summary judgment as to Plaintiff's Eighth Amendment claim is

granted.

### 2. Hibbs

Defendants maintain that there is no evidence from which the inference could be

drawn that Plaintiff faced a substantial risk of serious harm as required under the Eighth

Amendment.  I agree.

Here, there is a complete lack of evidence showing that Hibbs was deliberately

indifferent to Plaintiff's safety.  The undisputed evidence shows that there was no

indication of any violence or serious injury to Plaintiff or any other inmate the weeks

leading up to Plaintiff's alleged attack.  Scholl Decl., ¶ 8.  The evidence also shows that

Defendants routinely patrolled C-Pod the day Plaintiff was allegedly attacked.  See

LeGore Decl., ¶ 11; Id., Ex. 3, pp. 1-7.  The record shows that on June 7, 2010, various

deputies checked C-Pod twenty-five times before Plaintiff was attacked.  Id.  The

evidence also shows that Hibbs personally checked C-Pod a number of times on June 7,

2010, including at 1:11 p.m. and 1:27 p.m., just eight minutes before Plaintiff was allegedly attacked, and observed no indication of any gang behavior, racial tension, or threats of violence.  LeGore Decl., Ex. 3, pp. 1-7; Hibbs Decl., ¶ 5.  Similarly, the evidence shows that Scholl and Marcia Rush, a Deputy Sheriff at the Jail, did not notice any inmate behavior or risk of harm to Plaintiff before Plaintiff's altercation.  Scholl Decl., ¶ 8; Rush Decl., ¶ 5.  Rush stated that Plaintiff "appeared to be getting along with the other inmates" in C-Pod on June 7, 2010, and Plaintiff himself admitted during his deposition that "prior to the incident with Siclovan[,]" there had been no "incidents in C-pod involving fights or violence of any kind between inmates" and that everything had been "fine".  Rush Decl., ¶ 5; LeGore Decl., Ex. 2, p. 17.

The record fails to show that any of the Deputies on duty on June 7, 2010, had reason to suspect Plaintiff was in any danger.  Rather, the undisputed evidence before me establishes that Plaintiff's injury was the result of an isolated, random incident of prison violence.  Plaintiff proffers no evidence creating a triable issue of fact that Dickerson, Scholl, or Hibbs were aware of facts from which the inference could be drawn that a substantial risk of serious harm to Plaintiff existed, and no evidence showing that they drew such an inference.  Also absent are any facts creating a genuine issue of material fact as to whether Dickerson, Scholl, or Hibbs knew of and disregarded an excessive risk to Plaintiff's health and safety.  Based on the above, Defendants' motion for summary judgment as to Plaintiff's first claim for relief is granted.

### B. Third Claim: __Monell__ Violations

Plaintiff's third claim for relief alleges that "Dickerson, acting as the final policymaker for Columbia County as to [J]ail policies, . . . deprived [P]laintiff of his

Eighth Amendment rights, by promulgating and maintaining an unconstitutional policy of understaffing, to wit, two security deputies for upwards of 180 inmates, housing murderers and white supremacists in the general population . . . ."  Am. Compl., ¶¶ 14-15.  Defendants assert that Plaintiff's <u>Monell</u> claim against Columbia County fails because there is no evidence showing that Columbia County's inmate classification and staffing and supervision policies were deliberately indifferent to Plaintiff's constitutional rights.  Plaintiff proffers no evidence in support of his response to Defendants' motion.  Rather, he merely asserts that the statements by William Joner[6] and Rush, Columbia County's "override" policy, and Columbia County's "periodic reviews" required that Siclovan be classified as a Maximum security risk.  Plaintiff also conclusory states, without providing any evidence, that Defendants are not entitled to summary judgment because Dickerson ratified "the classification customs, policies, practices and procedures at Columbia County."  Resp., p. 3.  Plaintiff's unsupported arguments are insufficient to defeat Defendants' motion for summary judgment.

A government entity may be held liable as a "person" under § 1983.  <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978).  Under <u>Monell</u>, a plaintiff must prove that "(1) she was deprived of a constitutional right; (2) the [government entity] had a policy; (3) the policy amounted to deliberate indifference to her constitutional right; and (4) the policy was the moving force behind the constitutional violation."  <u>Mabe v. San Bernardino Cnty. Dep't of Pub. Soc. Servs.</u>, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (quoting <u>Van Ort v. Estate of Stanewich</u>, 92 F.3d 831, 835 (9th Cir. 1996)).  "To prove deliberate indifference, the plaintiff must show that the municipality was on actual or

---

[6] Joner is an inmate at the Jail.

constructive notice that its omission would likely result in a constitutional violation."

Gibson v. City of Washoe, 290 F.3d 1175, 1186 (9th Cir. 2002) (citation omitted).

"Locating a policy ensures that a municipality is held liable only for those deprivations

resulting from the decisions of its duly constituted legislative body or of those officials

whose acts may fairly be said to be those of the municipality."  Bd. of Cnty. Comm'rs v.

Brown, 520 U.S. 397, 404 (1997) (internal quotation marks and citations omitted).  An

act performed pursuant to a "custom that has not been formally approved by an

appropriate decisionmaker may fairly subject a municipality to liability on the theory that

the relevant practice is so widespread as to have the force of law."  Id.  "Liability for

improper custom may not be predicated on isolated or sporadic incidents; it must be

founded upon practices of sufficient duration, frequency and consistency that the conduct

has become a traditional method of carrying out policy."  Trevino v. Gates, 99 F.3d 911,

918 (9th Cir. 1996) (citations omitted).

### 1. Staffing and Supervision Policies

Policy J503 addresses the Jail's inmate supervision and staffing policies and

"[a]pplies to all [Jail] staff[.]"  LeGore Decl., Ex. 7, p. 1.  J503 requires that the Jail be

staffed by "trained and certified personnel" "[t]wenty-four hours per day[,] . . . [s]even

days per week", and that there be "a minimum of four staff members of which at least

three must be certified corrections officers . . .[, including] a supervisor on shift in the

jail. . . ."  Id.  J503 also requires that a Jail staff member be in the control room at all

times.  Id.; Id., Ex. 10, p. 2.

Here, the evidence shows that at the time Plaintiff was allegedly attacked on June

7, 2010, the Jail's staffing and inmate supervision exceeded the minimum standards set

forth under J503.  The undisputed evidence shows that the Jail had five certified

corrections deputies on duty at the time Plaintiff was allegedly attack, including a

supervising deputy in charge and a technician in the control room.  LeGore Decl., Ex. 10,

p. 2.  The evidence also shows that on June 7, 2010, the deputies had entered and checked

C-Pod twenty-five times between 6:30 a.m. and the time Plaintiff was allegedly attacked.

LeGore Decl., ¶ 11; Id., Ex. 3, pp. 1-7.  The evidence further shows that Hibbs performed

an hourly inmate count just minutes before Plaintiff's alteration with Siclovan and

LaVelle, and had found no problem or safety concerns in C-Pod.  Hibbs Decl., ¶ 5.  In

addition, the evidence shows that in a July 7, 2010, memorandum to the Jail's Captain,

Jim Carpenter, Dickerson concluded that his administrative review of the staffing and

inmate supervision procedures at the time Plaintiff was allegedly attacked revealed that

inmates had been supervised and the Jail had been staffed in accordance with J503.

LeGore Decl., Ex. 10, pp. 1-4.

Plaintiff proffers no evidence disputing Defendants' evidence.  Plaintiff's general,

unsupported disagreement with the Jail's staffing and inmate supervision policy is simply

insufficient to meet his burden of creating a genuine issue of material fact as to whether

Defendants were deliberately indifferent to his constitutional rights.  Based on the

evidence before me, I conclude that Defendants are entitled to summary judgment on

Plaintiff's Monell claim.

### 2. Classification and Override Policies

Plaintiff asserts Defendants' "policies of Overrides and periodic reviews

mandated an upgrade to Maximum Security after viewing Siclovan's tattoo, observing

[Siclovan's] racially hostile and tyrannical demeanor on C[-]Pod, . . . [and] a report from

Deputy Rush that Siclovan had potential for "trouble[.]"  Resp., p. 2.  Plaintiff also

asserts that his Monell claim survives summary judgment because if Dickerson had

created a report before Plaintiff's attack, it would have "shed light on C[-]Pod safety and

inmate and classification issues."  Additionally, Plaintiff contends that "[Dickerson] and

the County should be held liable for a Monell [sic] violation" because "Dickerson

approves and ratifies the classification customs, policies, practices and procedures at

Columbia County."  Id., p. 3.  Finally, Plaintiff maintains that "Dickerson could have

implemented the . . . Washington County report that evinces both employee and inmate

accounts of Siclovan and Lavelle's [sic] thuggish and racist behavior[,]" "Dickerson

could have polled all his deputies to ask if any knew of or sensed any dangerous

propensities or 'potential for trouble'" regarding Siclovan and LaVelle, and "Dickerson

could have asked a records technician to run any reports implicating Lavelle [sic] or

Siclovan . . . ."  Resp., pp. 3-4.  Plaintiff's arguments are unavailing.

### a. Classifications

Defendants argue that Siclovan, LaVelle, and Plaintiff were all properly classified

pursuant to the Jail's policies.  Defendants proffer evidence showing that LaVelle was

taken into custody at the Jail as a minor and was originally classified as a Maximum

security risk because of the seriousness of his pending charges, which included

Attempted Murder.  Because of his good behavior at the Jail and limited criminal history,

however, LaVelle was subsequently reduced to a Medium security risk.[7]  With regard to

Siclovan, Defendants present evidence showing that Siclovan's and Plaintiff's

classifications were consistent with the Jail's policies and the Oregon Jail Standards

_____

[7] Although LaVelle was accused of Attempted Murder, he was only convicted of
Attempted Assault.  LeGore Decl., Ex. 12, p.1.

("OJS").  Weaver Decl., ¶¶ 7-9; Dickerson, ¶ 8.  Defendants also proffer evidence showing that from 2001 to Plaintiff's alleged attack on June 7, 2010, the Jail only had two instances of inmate on inmate attacks resulting in serious injury, and that Plaintiff's injury was more serious than those two prior attacks.  Scholl Decl., ¶ 9.

In response, Plaintiff merely proffers his own interpretation of the facts, which according to Plaintiff establish that Siclovan and LaVelle should have been classified as Maximum security risks.  Plaintiff proffers no additional evidence showing that the combination of the pending charges against Siclovan or Lavelle, the nature of their convictions, their criminal history, or their behavior warranted classifications.  Plaintiff's unsupported arguments, by themselves, are insufficient to establish a genuine issue of material fact as to whether Siclovan and LaVelle were improperly classified.

### b. Override

Plaintiff asserts that Defendants violated his Eighth Amendment rights when they failed to "override" Siclovan and reclassify him as a Maximum security risk.  Plaintiff contends that Defendants should have assessed Siclovan as a Maximum security risk based on Siclovan's tattoo and "demeanor", Rush's report that Siclovan had a "potential for trouble", and Joner's March 4, 2010, complaint about Siclovan.  Plaintiff's assertions fail.

The Jail's override policy states:

Overrides: If it is determined that circumstances exist requiring a deviation from what would be considered a "normal" classification assignment, the Shift Supervisor will:
A.  Assign the inmate to the appropriate higher or lower security classification.
B.  List the assignment in the computer as an Override and list the reasons for the such override.

LeGore Decl., Ex. 6, p. 4.

Plaintiff's bald assertion that the override policy required Siclovan to be reclassified as a Maximum security risk is insufficient to create a triable issue of fact supporting his <u>Monell</u> claim.  With respect to Joner's report, Defendants refer me to Exhibit 1 of the Berman Declaration supporting Plaintiff's motion for summary judgment.  Exhibit 1 is a Jail Incident Report dated March 4, 2010.  Berman Decl., Ex. 1, p. 1.  The report states that Joner, an inmate who had been placed in D-Pod, had been "threatened" by Siclovan and had experienced previous "problems on the streets with . . . Siclovan[,] who was [then] in E[-]Pod." <u>Id.</u>  The report provides that "Siclovan had just found out that . . . Joner was in the facility and passed the word" and shows that the situation between Joner and Siclovan was ultimately resolved by moving Joner to A-Pod. <u>Id.</u>  With regard to Rush's statement, Defendants point me to Exhibit 4 of Berman's Declaration supporting Plaintiff's motion for summary judgment, wherein Rush states during her May 14, 2013, deposition testimony that "[Siclovan] had a potential for trouble."  <u>Id.</u>, Ex. 4, p. 30.

When considering the evidence before me, I conclude that it fails to create a genuine issue of material fact as to whether Defendants' alleged failure to reclassify Siclovan as a Maximum security risk amounted to a policy or custom, let alone a policy or custom that was deliberately indifferent to Plaintiff's constitutional rights.  The evidence before me also fails to create a genuine issue of material fact as to whether Defendants' actions were the moving force behind Plaintiff's alleged constitutional violations.  A careful review of Joner's report merely shows that Joner's encounter with Siclovan was a separate, isolated incident that occurred over four months before

Plaintiff's June 7, 2010, altercation.  In addition, Joner's report only establishes that a problem may have existed between Joner and Siclovan, not Plaintiff and Siclovan. Indeed, the record is absent any evidence showing that Siclovan threatened any other inmate, including Plaintiff before June 7, 2010.

Similarly, consideration of Rush's deposition statements in their entirety does not create a genuine issue of material fact supporting Plaintiff's Monell claim.  Although Rush stated that Siclovan had a "potential for trouble[,]" she also stated that it was "only [her] personal observation without any factual basis to support an official report" and that "Siclovan had behaved well" up until his altercation with Plaintiff.  Id.; Rush Decl., ¶ 7. Rush also stated that despite being "frequently in C-Pod[,]" she "did not ever notice or see any indication of racial tension or gang conflicts in C-Pod, and did not ever observe any indication of a possible threat or risk of racial or gang violence."  Rush Decl., ¶ 5. Rush further stated that she did not "observe any indication of a possible threat or risk of harm to [P]laintiff" and that Plaintiff "appeared to be getting along with the other inmates in [C-Pod]."  Id.  The record even shows that Rush was "surprised" that Siclovan and Plaintiff had an altercation because "Plaintiff was a big man, who [Rush] estimate[d to be around] 5'10" . . . and . . . well over 200 pounds[,]" whereas "Siclovan was a small man who was perhaps 5'6" tall [and] probably did not weigh much more than 160 pounds." Id., ¶ 6.  Consistent with Rush's statements, Defendants also proffer evidence showing that Hibbs stated he "did not ever notice any activity or behavior in C-Pod that indicated any risk of harm to [P]laintiff[,] . . . did not observe any indication of gang behavior or activity, and . . . did not observe any indication of any racial tension in . . . [C-]Pod" in the weeks leading up to June 7, 2010.  Hibbs Decl., ¶ 5.  Hibbs also stated that he "did

not receive any reports or complaints from any inmates about any tension, conflict, or threats of violence in C-Pod," and did not receive any reports from other Deputies about any "tension, conflict, or threats of violence in C-Pod" in the time leading up to June 7, 2010.  Id.  Additionally, Defendants proffer evidence showing that like Rush and Hibbs, Scholl did not notice "any inmate behavior" that would have "caused [him] to believe that there was a risk of violence in C-Pod or danger to [P]laintiff from any other inmate" and "did not notice any racial tensions or indications of racial violence" or "gang violence [in C-Pod]" in the time leading up to June 7, 2010.  Scholl Decl., ¶ 8.  Notably, Plaintiff proffers no evidence of Siclovan's tattoo or "demeanor" to which he refers, and does not articulate how Siclovan's tattoo or "demeanor" warranted Siclovan to be reclassified as a Maximum security risk.

Viewing all the evidence in the light most favorable to Plaintiff, I conclude that there is no triable issue of fact supporting Plaintiff's Monell claim.  Even when considering that Siclovan had a tattoo, Rush's statement that Siclovan had "potential for trouble", and Joner's complaint about Siclovan over four months before Plaintiff's alleged attack, I conclude that no reasonable jury could find that Defendants were on actual or constructive notice such that their omissions would likely result in a constitutional violation or that Defendants acted with deliberate indifference to Plaintiff's Eighth Amendment rights.  Rather, the evidence simply establishes that Plaintiff's June 7, 2010, altercation with Siclovan amounted to a one-time, isolated incident and was not the result of a policy or custom that was deliberately indifferent to Plaintiff's constitutional rights or the moving force behind Plaintiff's alleged constitutional violation.

/ / /

17 - OPINION & ORDER

### c. Ratification

"To show ratification, a plaintiff must show that the authorized policymakers approve a subordinate's decision and the basis for it." Lytle v. Carl, 382 F.3d 978, 987 (9th Cir. 2004) (internal quotation marks and citations omitted). The policymaker must have "knowledge of the constitutional violation and actually approve of it. A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." Id. Based on the evidence before me, I conclude that Plaintiff fails to meet his burden of establishing a triable issue of fact that Defendants unlawfully ratified unconstitutional Jail policies. As discussed above, Defendants' policies were not unconstitutional. In addition, Plaintiff provides no evidence showing that Dickerson, or anyone else with policymaking authority, had knowledge of any constitutional violation and approved of it. Plaintiff's argument that Dickerson could have done more before the attack, including "implement[ing]" additional reports, "poll[ing] all his deputies" about Siclovan and LaVelle, and "ask[ing] a records technician to run . . . reports implicating Lavelle [sic] or Siclovan", without more, is simply insufficient to create a triable issue of material fact supporting Plaintiff's ratification claim.

In sum, Plaintiff presents insufficient evidence creating a genuine issue of material fact as to whether Defendants knew of and disregarded an excessive risk to Plaintiff's health and safety, or were otherwise deliberately indifferent to Plaintiff's constitutional rights. Defendants' motion for summary judgment is granted as to Plaintiff's third claim for relief.

/ / /

### C. Second Claim: Negligence

Plaintiff's second claim for relief alleges that Columbia County acted negligently when "hiring, training and supervis[ing] . . . deputies Hibbs and Scholl", that Defendants were negligent "in failing to timely and and [sic] expeditiously protect [P]laintiff from attack, and or minimize injury," and were negligent in "housing . . . a murder [sic] . . . and . . . white supremacists in the general population."  Am. Compl., ¶¶ 11-13. Defendants argue that there is an absence of any genuine issue of material fact as to whether Defendants caused Plaintiff's injury.  I agree.

### 1. Hiring, Training, and Supervising

Plaintiff fails to create a triable issue of fact as to whether Columbia County's hiring, training, or supervision of Defendants caused Plaintiff's injury.  As discussed above, the evidence shows that the policy under which Siclovan, LaVelle, and Plaintiff were classified was proper; Siclovan, LaVelle, and Plaintiff were properly classified under the Jail's classification policy; and the staffing and inmate supervision at the time Plaintiff was allegedly attacked was proper.  In addition, Defendants proffer evidence showing that the Jail's policies met all of the requirements set forth under state and federal law, including the OJS, and showing that the Jail's policies were continually reviewed and revised by Oregon State Sheriffs Association members, staff, and attorneys. Dickerson Decl., ¶ 13.  Plaintiff proffers no evidence disputing Defendants' evidence. Defendants' motion for summary judgment as to Plaintiff's claim that Columbia County was negligent in hiring, training, or supervising Defendants is granted.

/ / /

## 2. Minimize Injury

Plaintiff also fails to create a triable issue of fact as to whether Defendants "minimized" his injury after he was allegedly attacked.  Defendants proffer evidence showing that Hibbs attended to Plaintiff less than one minute after receiving a call that Plaintiff was in need of medical attention.  Hibbs Decl., ¶ 4, 6.  The evidence also shows that Plaintiff was examined soon after his altercation with Siclovan and LaVelle and was taken to the hospital by ambulance within twenty-six minutes after his attack.  Rush Decl., ¶ 4; LeGore Decl., Ex. 3, p. 7.  Plaintiff proffers no evidence creating a genuine issue of material fact that Defendants caused Plaintiff's injury or were otherwise negligent.  Defendant's motion for summary judgment is granted.

## 3. Housing a Murderer and White Supremacist

To the extent Plaintiff claims that Defendants were negligent by "housing . . . a murder [sic] . . . and . . . white supremacists in the general population", Plaintiff's claim fails.  Am. Compl., ¶ 13.  As discussed above, Plaintiff falls short of creating a triable issue of fact as to whether the Jail's policies were improper.  In addition, there is no evidence showing that Siclovan or LaVelle are murderers or white supremacists. Plaintiff presents no evidence showing that Siclovan or LaVelle have murdered anyone.[8] Plaintiff also fails to present any evidence establishing that LaVelle is a white supremacist.  With regard to Siclovan, even assuming that he has a tattoo, Plaintiff proffers no evidence showing that Siclovan's tattoo, by itself, establishes that he is a white supremacist.  Even assuming that Plaintiff sufficiently established that Siclovan

---

[8] The record only shows that LaVelle was convicted of Attempted Assault.  LeGore Decl., Ex. 12, p. 1.

and LaVelle were white supremacists, that fact alone would not create a genuine issue of material fact that Defendants caused Plaintiff's injury or that Defendants were negligent.

In sum, Plaintiff fails to create a genuine issue of material fact supporting his negligence claim.  Defendants' motion for summary judgment is granted.

## II. Plaintiff's Motion for Partial Summary Judgment

Plaintiff asserts he is entitled to summary judgment on all of his claims. Plaintiff's motion is denied.[9]

### A. First Claim: Eighth Amendment

Plaintiff asserts that he is entitled to judgment as a matter of law because LaVelle should have been classified as a Maximum security risk based on his attempted murder charge.  Plaintiff also asserts that he entitled to summary judgment because Siclovan was not properly classified as a Maximum security risk based on the lightning bolt tattoo on the side of his head, his "racially hostile and tyrannical demeanor[,]" Defendants' "Overrides and periodic reviews", Joner's report, and Rush's comment that Siclovan had a "potential for trouble".  Pl.'s Opening Br., pp. 8-9.  For the same reasons that I grant Defendants' motion for summary judgment, I deny Plaintiff's motion for summary judgment.  The record is absent any evidence establishing that Defendants were deliberately indifferent to Plaintiff's constitutional rights.  Notably, Plaintiff does not even mention Hibbs and Scholls in his opening brief, let alone establish how they personally violated his Eighth Amendment rights.  Plaintiff also fails to establish how

---

[9] It is worth mentioning that Plaintiff fails to support his arguments with specific cites to the record.  In places where Plaintiff proffers evidence specifically supporting his arguments, he merely cites to the section of his brief entitled, "Undisputed Facts".  A careful review of Plaintiff's "undisputed facts", however, demonstrates that many of those facts are disputed and amount to Plaintiff's own interpretation of the facts.

Dickerson violated his Eighth Amendment rights where the undisputed evidence shows that Dickerson was not even on duty or present at the Jail the day Plaintiff was allegedly attacked.  Dickerson Decl., ¶ 3, 10.  Plaintiff's motion for summary judgment on his claim that Defendants misclassified LaVelle is denied.

**B. Second Claim: Negligence**

Plaintiff conclusory asserts that he is entitled to summary judgment on his negligence claim because "[a]bsent negligence [sic] negligent hiring, training, supervision, and discipline, [P]laintiff would not have been injured viciously."  Pl.'s Opening Br., p. 11.  In his reply, Plaintiff contends that "[a]bsent negligence in training and supervision, Marcia Rush's complaints about Siclovan as a 'potential threat[]' would have been recorded and acted upon to protect [Plaintiff] . . . ."  Pl.'s Reply, p. 2.  Plaintiff also contends in his reply that "Hibbs' and Scholl's failure to observe Siclovan as a 'potential' threat' [sic] . . . , . . . failure to perceive Siclovan and Lavelle [sic] 'running the pod,' and representing a hostile presence on the Pod . . . implicates negligent training and supervision of Hibbs and Scholl."  Pl.'s Reply, p. 2.  Plaintiff's vague arguments and the evidence on which he relies simply do not support the conclusions that Defendants caused his injury or otherwise acted negligently as a matter of law.  Plaintiff does not specifically identify who acted negligently and proffers no evidence supporting the conclusion that Defendants acted negligently in training and supervising Hibbs and Scholl.  Notably, Plaintiff does not even argue, let alone offer any evidence, establishing how Defendants acted negligently in their "hiring".  Plaintiff's motion for summary judgment is denied.

/ / /

### C. Third Claim: <u>Monell</u> Violations

Plaintiff's <u>Monell</u> claim fails for the same reasons supporting Defendants' motion for summary judgment. As discussed above, Plaintiff proffers insufficient evidence showing that the policies he challenges were deliberately indifferent or the moving force behind his alleged constitutional deprivation. Plaintiff also presents insufficient evidence showing that Columbia County was on actual or constructive notice that its policies would likely result in a constitutional violation or that Dickerson disregarded a known or obvious consequence of his action. Indeed, the evidence on which Plaintiff relies supports the conclusion that Columbia County was not on notice that its policies would likely result in a constitutional violation and that Dickerson did not disregard a known or obvious consequence of his action. For example, Plaintiff relies heavily on the July 7, 2010, memorandum Dickerson wrote concerning the administrative review of the Jail's procedures "leading up to and following" Plaintiff's attack. Berman Decl., Ex. 5, pp. 1-2. In the July 7, 2010, memorandum, Dickerson concluded that Jail "[s]taff reported . . . that a review of the classification of each of the individuals involved in [Plaintiff's alleged attack] were appropriately classified at the time . . . ." <u>Id.</u>, p. 2. Dickerson's July 7, 2010, report also concludes:

> Staff reported that were no need for changes in the classification system that were readily apparent. Because of his felony status, [Plaintiff] was a higher[-]level classification than someone with only a misdemeanor, non-assaultive background. Inmates Siclovan and Lavelle [sic] were not classified as Maximum Security . . . and did not initiate the contact with [Plaintiff]. There is no way for Staff to know beforehand that there would be trouble between [Plaintiff] and other inmates. Staff advised that at the time of the classification, each inmate is asked if they have any concerns about being housed with anyone prior to being placed in a pod. Gang affiliations and other risky relationships are the focus of this questioning. [Plaintiff] gave no indication that he had difficulties with others during this questioning. Staff noted that a big contributor to [Plaintiff' June 7,

2010, altercation] was . . .  the actions of [Plaintiff] in violating jail rules by entering another inmate's cell–something that cannot be solved by changing an inmate's classification.

Id.

Although Plaintiff disagrees with how Siclovan and LaVelle were classified, his mere disagreement and the evidence he cites simply do not establish that Siclovan or LaVelle were in fact misclassified or otherwise establish that he is entitled to summary judgment on his Monell claim.  It is also worth noting that Plaintiff does not even articulate or cite which policy he challenges.  Simply put, Plaintiff fails to meet his burden of showing that the Jail's policies were so deficient that they were deliberately indifferent to his constitutional rights.  Plaintiff's motion for summary judgment as to his Monell claim is denied.[10]

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (dkt. #57) is GRANTED and Plaintiff's motion for partial summary judgment (dkt. #51) is DENIED.

IT IS SO ORDERED.

Dated this ⎽⎽ day of ⎽⎽Oct⎽⎽, 2013.

_____
MARCO A. HERNANDEZ
United States District Judge

---

[10] Plaintiff also asserts he is entitled to punitive damages as a matter of law because Dickerson "demonstrated a callous and reckless indifference to Mr. Batista's federally-protected rights to be free of an inmate vicious and maiming assault by failing to adhere to classification norms on Lavelle [sic], heed Joner [sic] complaints racial hostilities [sic], and Deputy Rush [sic] complaints." Pl.'s Opening Br., p. 9. Having concluded that Plaintiff is not entitled to summary judgment on any of his claims, I conclude that he is not entitled to the punitive damages he seeks.